ALLYN *against* MATHER.

Allyn
*v.*
Mather.

In 1764, *A.* made his will, by which he devised lands to his son *B.*, and added, "and after my said son's death, my will is, the said lands shall be equally divided to my two grandsons *C.* and *D.* during their natural lives, and after their decease, to each of the eldest sons, lawfully begotten, and so from eldest son or sons forever; and in case they should have none, to the eldest male child of any of my three sons; and so from eldest to eldest to the end of time." The testator died, soon afterwards, leaving three sons. His grandson *D.* is still living, having several daughters, but no son. *C.*, his other grandson, died in 1829, having had four sons,, *E.*, *F.*, *G.* and *H.* and two daughters. *E.* and *F.* died before their father, one in 1822, the other in 1825; and the other children of *C.* still survive; *G.* being the eldest son of *C.* living at the time of his father's death. *E.* had one child only, a daughter, named *M.*, who is still living. *F.*, the second son of *C.*, left children, male and female, who still survive. The lands described in the will were duly distributed under the will, to the testator's grandsons *C.* and *D.* The share set to *C.* was successively held and occupied by *B.* and *C.* until their respective deaths, after which *M.* took possession. In ejectment brought by *G.* against *M.* for such share, it was held, 1. that *B.*, the son, and *C.* and *D.*, the grandsons, of the testator, took estates for life in the premises, the former by clear implication, and the latter, by the express words of the devise; 2. that the share of *C.* was limited, on his decease, to *G.*, the eldest son living at his father's decease; this being in conformity with the particular intent of the testator, and contravening no rule of law, as *G.* is the immediate issue of a person in being at the time the will was made, and is, therefore, capable of taking as a purchaser; 3. that in order to effectuate the general intent of the testator, which was to create an interminable succession of estates, the estate vested in *G.* must be a fee-tail.

The possession of a party, claiming an exclusive right to possess, is sufficient evidence of an ouster.

THIS was an action of ejectment for two tracts of land in *Windsor.*

The cause came on for trial, at *Hartford*, *February* term, 1831, before *Peters*, J., when a case embracing the following facts, was agreed to. Both parties claimed title under the will of *Pelatiah Allyn*, who formerly owned the demanded premises, and died seised thereof, more than forty years ago. The will was made in 1764. The clause which embraced these lands, and on which the title of the parties respectively depended, was as follows:

" *Item*, I give to my son, *Samuel Wolcott Allyn*, besides what I have given him, my dwelling-house and barn and lands adjoining to each, about forty acres, more or less, only reserving one third part of said buildings and lands for my wife, during her natural life; and after my said son's death, my will is, the said buildings and lands shall be equally divided to my two

grandsons, *Samuel Allyn* and *Wolcott Allyn*, during their natural lives, and after their decease, to each of the eldest sons, lawfully begotten ; and so from eldest son or sons forever ; and in case they should have none, to the eldest male child of any of my three sons ; and so from eldest to eldest to the end of time." Soon after the testator's death, his will was duly established. His wife, *Mary Allyn*, died soon after his decease, and before the death of either of his sons. He left three sons, *Samuel*, *Pelatiah* and *Solomon*. His grandson *Wolcott Allyn*, named in the will, is still living, having several daughters, but no son. *Samuel Allyn*, the other grandson named in the will, had four sons, all of whom were born after the testator's death, *Eli B.* his eldest son, *Henry*, *Richard* and *Samuel W.*, and two daughters. *Samuel Allyn* died in 1829 ; his two eldest sons, *Eli B.* and *Henry*, having died before him, *viz. Eli B.* in 1822, and *Henry* in 1825. The other children still survive. *Eli B.* had one child only, a daughter named *Mary E.*, a minor, still alive, in whose right, as her guardian, the defendant claims the demanded premises. *Henry* left children, male and female, who still survive.

*Richard Allyn*, the plaintiff, was the eldest son of *Samuel* deceased, living, at the time of his father's death. The real estate described in the clause of the will above recited, was duly distributed, under the will, to the testator's grandsons *Samuel* and *Wolcott ;* and the demanded premises are a part or the whole of the share set to *Samuel*. This was successively held and occupied by *Samuel Wolcott*, the son, and *Samuel*, the grandson, of the testator, named in the will, until their respective deaths, after which, and before the commencement of the present suit, the defendant took and still holds possession.

The case was reserved for the consideration and advice of this Court.

It was argued, in June 1831, by *Hungerford* and *W. W. Ellsworth*, for the plaintiff, and by *Sherman* and *F. Parsons*, for the defendant. The Court, after consultation, continued it to this term, *to advise*.

The counsel for the plaintiff contended, 1. The the daughter of *Eli B. Allyn*, under whom the defendant claims, has no title, by virtue of *Pelatiah Allyn's* will ; because——

*Hartford,*
June 1832.

Allyn
*v.*
Mather.

First, It is obvious from the will, and was understood by the plaintiffs' counsel, to be admitted by the defendants' counsel, that *Samuel W. Allyn*, took a life estate only.

Secondly, It was in like manner understood to be admitted, that the will created an estate tail in some person.

Thirdly, If so, either *Samuel W. Allyn*, grandson of the testator, *Eli B. Allyn*, *Samuel's* son, or the present plaintiff must have been the *first donee* in tail.

Fourthly, If the present plaintiff was first donee in tail, it is obvious the daughter of *Eli B. Allyn* takes nothing.

Fifthly, If *Samuel Allyn* was first donee in tail, *E. B. Allyn's* daughter can take nothing from him, unless as the representative of her father, he having died before *Samuel*.

Sixthly, If *E. B. Allyn* was first donee in tail, his daughter cannot take, unless as heir to him.

Seventhly, The statute of *Connecticut* has not altered its common law, in regard to the effect of an entailment ; and a person may here so far direct the descent from the immediate donee, as to limit it to a particular heir of his body, in exclusion of others ; and the estate once vested in that particular heir, becomes an estate in fee simple.    1 *Swift's Syst.* 249.    1 *Swift's Dig.* 79. near the bottom.    *Welles* & ux. v. *Olcott, Kirb.* 118.    *Chappel* & al. v. *Brewster, Kirb.* 175.    *Hamilton* v. *Hempsted,* 3 *Day* 332.    See also the description of an estate tail in 2 *Bl. Comm.* 113. which, *ex vi termini*, implies an estate capable of descending and limited to particular heirs.

Eighthly, A person to take by descent, in case of an entailment, must be capable of taking *per formam doni ;* and this the daughter of *E. B. Allyn* cannot do, either from *Samuel Allyn* or her own father.

Ninthly, She cannot take upon the principle of *cy pres*, because females are by the will excluded, to the most remote generation.

2. That under the will, *Samuel Allyn* takes an estate for life, remainder to his eldest son in tail male, remainder to himself in tail male ; because,

First, The estate is expressly given to him for life, by the will ; and this is the *particular intent* of the testator.

Secondly, The limitation over to the eldest male child of any of the testator's three sons, is to take effect, if *Samuel* and *Wolcott* have no son, and not otherwise.

Thirdly, It is hence to be inferred, that all the sons of *Sam-*

*Hartford,*
*June 1832.*

*Allyn*
*v.*
*Mather.*

*uel* and *Wolcott* are to take before the limitation over has effect ; and this is the *general intent* of the will. *Robinson* v. *Robinson,* 1 *Burr.* 38. *Doe* d. *Cock* v. *Cooper,* 1 *East* 229. *Doe* d. *Bean* v. *Halley,* 8 *Term Rep.* 5.

Fourthly, The construction must be such, if it can, as to give effect to every word of the will, and the particular as well as the general intent of the testator. *Roe* d. *Nightingale* v. *Quarterly,* 1 *Term Rep.* 680.

Fifthly, By the construction above claimed, as well the particular as the general intent of the testator is effectuated. *Doe* d. *Bean* v. *Halley,* 8 *Term Rep.* 5.

3. That the remainder limited upon the life estate of *Samuel Allyn,* was contingent until his death, and then vested in his eldest son living at the time, who was the plaintiff ; because,

First, The testator, in alluding to the death of *Samuel Allyn,* alludes to an event then future ; and the eldest sons spoken of in the will, must be understood with reference to that event ; consequently, the eldest sons then living.

Secondly, The expression " eldest sons," does not necessarily mean the *primogeniti* or first born. *Lomax* v. *Holmden,* 1 *Ves.* 290.

Thirdly, The same reason for the law inclining to embrace the first opportunity of vesting a contingent estate, does not exist in *Connecticut,* as in *England ;* the object in *England* being to prevent the destruction of the remainder, while it is contingent, by a fine or recovery, whereas in *Connecticut* a fine or recovery can have no more effect upon a contingent than a vested remainder.

Allowing the remainder limited upon the life estate of *Samuel Allyn* to be vested in *E. B. Allyn,* at the time of his birth or coming *in esse,* upon his, *E. B. Allyn's,* death, without male issue, the estate, by virtue of the remainder in tail, is in *Samuel Allyn* or his issue, such as can inherit *per formam doni ;* and the order of the descent would be thus. In *England,* to the eldest son of *Samuel Allyn* and his representatives, not however because the will, but the laws of inheritance, direct this order of descent ; the will doing nothing more than to exclude particular heirs, and the law or canons of descent directing the order, in which those who are left by the will to inherit, shall take. *e. g.* An estate is divided to *A.* and the heirs male of his body. Other persons than the heirs male of *A's* body are, by the will, excluded from the inheritance ; but the order in

*Hartford,*
*June 1832.*

Allyn
*v.*
Mather.

which the heirs male of *A.* shall inherit, is not designated by the will, but by the law or canons of descent ; and the canons of descent, admitting the doctrine of primogeniture, cast the estate upon the elder before the younger son. Hence in *England*, probably, a second or third son could not take an estate tail before the first by limitation, as this must necessarily interrupt the course of descent.

In *Connecticut*, the canons of descent would, upon the death of *Samuel Allyn*, (and there is nothing, in this case, in the will to prevent it) give the estate equally to all his male children, and those who represent them, because they, by the will, are not excluded from the right of inheritance, and not being excluded by the will, the statute of distributions points out the order, and says they shall inherit equally. Hence, in *Connecticut*, a second or third son may (it is believed) take by limitation, to the exclusion of the first, the channel through which the estate passes from the ancestor to the heir being only contracted in width, and not wholly obstructed or diverted, nor the order of descent broken.

The consequence is, that the plaintiff would take an estate in common with his brothers, and their representatives, to the exclusion of the daughter of *Eli B. Allyn*, and be entitled to a recovery in this suit.

5. That supposing it to have been the intention of the testator to create a reversion of life estates merely, the particular estates created by the will, which could be of any effect, would at least determine on the death of *Samuel Allyn*, and not be good for twenty-one years after. *Griffiths* v. *Vere*, 9 *Ves* jun. 130. Consequently, the estate supposed, would revert to the heirs of *Pelatiah Allyn*, of whom the plaintiff is one.

The counsel for the defendant, remarked, That in considering this case, it was necessary, first, to ascertain in whom the estate now is, according to the intent of the testator, admitting that it is not controuled by any rule of law.

In relation to this point, they observed, first, that he intended, that *Samuel Wolcott*, his son, should have a life estate in all the property devised. Of this there is no doubt. Secondly, that on the death of *Samuel Wolcott*, it should vest, for life, in his grandsons *Samuel Allyn* and *Wolcott Allyn*, and be divided equally between them. On this point, too, the will is explicit. Thirdly, he has given it "after their decease, to

*Hartford,*
*June, 1832.*

Allyn
*v.*
Mather.

each of their eldest sons lawfully begotten, and *so* from eldest son or sons forever ; and in case they have none, to the eldest male child of any of his three sons, and *so* from eldest son to eldest son, to the end of time." *Wolcott Allyn* is living, and is clearly seised of a life estate in the moiety distributed to him under the will. Here this part of the estate now is. The other half was distributed to the other grandson, *Samuel Allyn,* named in the will. He left four sons and two daughters, at his death, in 1829. These are all living, except *Eli B. Allyn,* his eldest son, who died in 1822, and *Henry Allyn,* his second son, who died in 1825. *Eli B.* left one child only, *Mary E. Allyn,* whose tenant the defendant is. *Henry* left several sons and daughters, who are still living. *Richard,* the plaintiff, was the third son of *Samuel,* and the oldest who was living at his father's decease in 1829.

The testator expresses a clear intention, that the moities given to *Samuel* and *Wolcott,* should respectively vest in life estates, successively, in the eldest male child of the two younger sons of the testator and all their male descendants, forever, from the part allotted to *Samuel,* now in dispute ; inasmuch as the limitation to the sons of those younger sons was to take effect only in case his grandsons, *Samuel Allyn* and *Wolcott Allyn* " *left* none," and *Samuel,* who died in 1829, had and *left* sons.

In some of these sons of *Samuel,* or in their descendants, the estate in controversy must now exist, according to the intent of the testator, if that intent be not contrary to any rule of law.

The testator intended, that the estate should devolve from eldest son to eldest, " so" as it did from his son *Samuel Wolcott,* to his grandsons *Samuel* and *Wolcott ; i. e.* that each oldest son of each oldest son in the whole line, forever, should have an estate for life to vest *in possession,* on his father's death. Both by the intent and by the rules of law, until a son was born to *Samuel Allyn,* the fee of his moiety was in abeyance. As there is a particular estate in the father, on the termination of which a life estate is to vest in the son, such life estate in the son is a remainder, and not an executory devise. Until the birth of a son to *Samuel,* the remainder to his son was contingent ; because, though the event on which *Samuel's* estate was to terminate, *viz.* his death, was uncertain, yet the person in whom the remainder was to vest not being *in esse,* the remainder was contingent, and the whole fee, during that time, was

in abeyance. 2 *Bla. Com.* 110. But as soon as *Eli B.*, the eldest son of of *Samuel Allyn*, was born, the remainder, which was limited to him, vested, and was no longer contingent in interest, although by his death before the preceding tenant for life, it might never vest in him in possession. As he left no son at his decease, and the intention of the testator was, that the estate should continue from oldest son to oldest son forever; and there were no remainders limited to any younger son, on failure of the line of the oldest, there was no person to take, coming within the designation in the will, when *Eli B. Allyn* died. That the estate *vested* in him, is evident from the uniform and settled rules on this subject. See 1 *Fearne on Cont. Rem.* 328. 4 *Kent's Com.* 194.

But if the general intent of the testator should be supposed to be, that on the decease of the eldest son without issue, a remainder for life should go to the next oldest, then on the death of *Eli B.*, the remainder for life next limited would vest in *Henry*, the eldest surviving brother of *Eli B.*, for life, remainder for life to the eldest son of *Henry*. On *Henry's* death, in 1825, the *possession* would fall on his eldest son, in whom the interest had already vested; and in him, according to this construction of the will, the estate is now to be found. To the plaintiff, *Richard Allyn*, the third son of *Samuel*, the property cannot possibly belong, by the express intent of the devisor, so long as male issue of *Henry* are in existence. Upon the last-mentioned safe position, that on failure of issue male of the eldest son of *Samuel*, the next eldest is to take, the plaintiff will not be aided, as on a lateral devolution of the property from *Eli B.*, in whom it was unquestionably once vested, it would be intercepted, by *Henry* and his male issue now living, and not extend to the plaintiff. If, therefore, either the plaintiff, or *Mary E. Allyn*, under whom the defendant claims, have any title, it is not by the limitations in the will only, but must be by some rule of law operating upon and qualifying or diverting them.

But by well settled rules of law, and by the statute of this state, the issue of unborn issue cannot take as purchasers. By our statute, no estate can be given, by deed or will, but to persons in being, or to the *immediate* issue or descendants of such as are in being, at the time of making such deed or will. All the children of *Samuel* were born, not only after the will was made, but after the testator's death. None of them, therefore,

*Hartford,*
*June, 1832.*

Allyn
*v.*
Mather.

can take as remainder-men or purchasers. If the will of the testator is not utterly defeated, after the expiration of the life estates, which precede those limited to the unborn issue, it must be preserved, in part or in whole, by annexing to some of those preceding life estates qualities, by which they may go to the last issue by descent; for they cannot go by purchase. And although the issue of the unborn issue cannot take as purchasers, yet if there were even an express limitation, on failure of them, to the next brother, still the next brother could not take, while those issue were in existence; for the law will not carry the estate over to a surviving brother, in the same manner as it would if they were dead, or were aliens, or otherwise legally incompetent to take. The plaintiff can get nothing on this ground. This is fully shewn, by *Buller,* J., in giving the opinion of the court in *Robinson* v. *Hardcastle* & al. 2 *Term Rep.* 241. 253. Though the children cannot take, says he, they still prevent the limitation over. Consequently, neither the issue of *Eli B.* or *Henry,* nor any brother or other person, can take under this will, unless its limitations are modified; but without such modification, it ceased to operate, at latest, when *Henry* died and left male issue, to whom the devise was too remote. Rather than every subsequent limitation in the will should be defeated, and the property become intestate, the law, after the estate has gone, according to the particular intent expressed in the will, as far as it can, will convert the life estate of the first unborn issue into an inheritance, by which means the issue of such issue will take by descent. This is done, not after the issue are born, and in view of the circumstances as they may then exist; but as soon as the will is consummated, and in contemplation of the circumstances which may probably exist. Where the limitation is in successive life estates to the sons *forever,* in this case, it is evident the testator meant to dispose of the *whole* fee, and did not intend that any of his heirs should ever be entitled to any thing in it, except the class which is designated in the will. The most that can be done to aid this general intent, is, to vest the first unborn issue with a fee tail. By this means, the estate will *descend* to *his* issue; and without it, such issue cannot take at all.

In *England,* where there are successive life estates given to the line of *eldest* sons forever, an estate in tail male would precisely meet the views of the testator, were it not in the power of the first donee in tail to *bar* his issue, by an appropriate

*Hartford,*
June, 1832.

Allyn
*v.*
Mather.

conveyance ; as by common recovery, &c.   But this being as near his intent as the rules of law will admit, the doctrine of *cy pres* is applied, and such an estate tail is created.   In this state, on the other hand, the intent cannot be defeated, by the alienation of the first donee in tail, for such donee cannot here aliene ; but as, by our statute of distributions, the eldest son is not heir, but *all* the issue take alike, and take in fee, the intent of the testator will not be precisely met, unless a single son should be the representative of his ancestor.   The inability to aliene will render the first descent here more secure than in *England ;* but the liability of the estate to subsequent partition will diminish the chances of succession to a single son, and in that respect, may be less accordant with the intention of the devisor.   But, both here and there, the estate tail is *nearest* to that which he intended to be given.   And where in that country, an estate was given to a *second* son, *then unborn, for life*, and after his death, to *his second* son ; the limitation to the first-mentioned second son, was an estate tail.   *Nicholl* v. *Nicholl*, 2 *Bla. Rep.* 1159.

That case was as follows.   *John Nicholl* devised to the second son of *William Nicholl*, then unborn, for life, and after his death, or if he should inherit his paternal estate, to *his* second son and his heirs male, with limitations over.   It was held, that the estate would vest in the second son of *William Nicholl, when born*, as an estate tail, though given expressly for life ; because the second son of such second son of *William* could not take as a purchaser, being too remote ; and an estate tail in the second son of *William* would come nearest to the accomplishment of the intent.   Now, it is apparent, that this limitation in tail on the second son of *William*, would not come as near the intent of the testator as a limitation in tail in *Connecticut*.   For there cannot be such an entailment in *England* to *second* sons.   The first or oldest son, where there are more sons than one, is, in that country, the only heir male of the body.   A second son of *William's* second son, having an elder brother, could not take the estate tail, although he was the specific and only object of the testator's bounty.   Still, the estate tail was created in *William's* second son, instead of the estate for life expressly given, in order to prevent an entire termination of the devise at the decease of *William's* second son, and answer the general intent of keeping the estate as long as possible in that branch of the family.   *Humberston* v. *Hum-*

*berston,* 1 *P. Wms.* 332.     2 *Term Rep.* 328. 333. n. *a.* (*Pow.*
ed.)     *Pitt* v. *Jackson,* 2 *Bro. Ch. Ca.* 61. 44.     *Chapman* d.
*Oliver* & al. v. *Brown* & al. 3 *Burr.* 1626.     *Robinson* v. *Hard-
castle,* 2 *Term Rep.* 241.

Upon these principles, the life estates expressly given by
the testator are to continue in succession as long as the rules of
law will admit; and the last who can take by purchase, is to take
an estate tail.     This is the legal effect of the will, considered
at the moment of the testator's death.     It was then unknown
whether the unborn eldest son of *Samuel* would leave a son
or not.     But as his issue could never take by purchase, the es-
tate limited to him was an estate tail.     As has been already
shewn, it *vested* in him at his birth, in interest ; and he died
seised of that interest as an estate tail.     On his death, one of
three results took place : Either, first, the estate tail descend-
ed on his issue, though a female ; or, secondly, it went to his
brother *Henry,* who was then living, and has descended on his
sons ; or lastly, the limitations by the will became exhausted,
and the property intestate, subject to distribution among all
the heirs at law of *Pelatiah Allyn,* the testator.     The last re-
sult cannot have occurred, if either of the others has.     In nei-
ther case, has the plaintiff any title *by the will.*

The counsel insisted, that the first mentioned result has tak-
en place, and that the property is now in *Mary E. Allyn,* as
whose tenant the defendant holds.     Inheritances, in this state,
are not guided by any preference of males to females.     *Heirs
male,* as a distinct class, are unknown to our law.     Not so in
*England.*     By their general canons of descent, males take in
exclusion of females.     They are distinct classes, and are nev-
er taken together.     An estate there cannot be so limited as to
go to both, in tail or otherwise.     Upon the principles of our
departure from their rules, it cannot be so limited here as to go
to one class in exclusion of the other.     We know but one class ;
they have two.     We can no more limit an entailment to ex-
clude females, than they can limit one to younger males in ex-
clusion of eldest sons.     An entailment, there, on younger sons,
or to the oldest daughters, forever, would be unavailing.     They
have two classes of heirs, to either of which an estate tail may
be limited ; but neither class, there, can be divided or modifi-
ed.     An estate in tail male *must* descend to the *oldest* son, and
an estate in tail female must descend to *all* the daughters.     In-
dulgent as they are to testators, they will not admit of any

modification of that entire class of heirs, to which an estate tail is limited. That is governed by the common law. By that law, none but the oldest son can inherit; and *all* the daughters must inherit, if any. Under the statute *de donis*, the rule is the same; except only, that one entire class may be preferred in exclusion of the other. By our canons of descent, we have one class only. A preference of sons to daughters, or of daughters to sons, in this state, is as impossible as an entailment on oldest sons in exclusion of the rest. By the same rule that they cannot divide the class of females, or modify that of males, we cannot divide males and females. All the females, by the *English* law, constitute but *one* heir; and this is true, with all its consequences, by our law, as to all the children, both male and female. Hence our statute regarding entailments is express, that all estates given in tail, *shall* be and remain to the *issue* of the first donee in tail. No regard is had to the form of the gift. The estate vested by purchase, in *Eli B. Allyn,* as the first donee in tail. According to the genius of our law, and the express provision of the statute, it *shall* vest in his issue. Had he left sons and daughters, they would have constituted, collectively, but *one heir of the body,* and been jointly entitled to the estate. Although this statute was made after the will in question; yet it is admitted, and has been decided, to be in affirmance of the preexisting common law. The law of primogeniture, and of preferring "the most worthy of blood," together with estates tail and all their refinements and distinctions, were odious to our ancestors. They have abolished the whole system, except only, that they have prohibited the alienation of estates given in tail, and limited their descent to *all* the issue, in exclusion of other heirs. The state of *New-York* have gone one step further, and abolished estates tail altogether. 1 *N. Y. Rev. Stat.* 723, 4. *sec.* 17. 19.

HOSMER, Ch. J. I will, in the first place, attend to the construction of the will, and the application of it to the claims of the parties, respectively, in this case.

It is on both sides admitted, and requires no discussion, that the son and the grandsons of the testator took estates for life in the premises; the former by close implication, and the two latter by the express words of the devise.

I now come to the clause, on which the controversy between the parties depends. It is expressed in the following words:

*Hartford,*
June, 1832.

Allyn
*v.*
Mather.

"*And after* their decease, (that is, the death of the testator's grandsons,) to each of *their eldest sons* lawfully begotten, and so from eldest son or sons forever ; and *in case they should have none*, to the eldest male child of any of my three sons, and so from eldest to eldest to the end of time."

The controversy between the parties is precisely this. The defendant insists, that by the expression in the will, " after their decease to each of their eldest sons," the testator limited the estate to *the first born*, that is, to *Eli B. ;* while the plaintiff contends, that the limitation was to *the eldest son living at his father's decease*, that is, to himself.

It is an established principle, founded on the *jus disponendi,* one of the essential attributes of property, that a person may dispose of his estate, by his last will and testament, as he pleases, provided such disposition be not inconsistent with the rules of law. To go beyond this would permit every man to make a new law to himself, and thus to render vague and indeterminate, the metes and bounds of property.

Hence, the first and great object of enquiry, on the construction of last wills, is, what was the intention of the testator ? 6 *Cruise's Dig.* 172. When this is attained, it next becomes necessary to ascertain, how far the intention is compatible with the rules of law. And in relation to the construction of a devise, it is observable, that *all* the words of the will are to be taken into view, and not a part of them only ; as every word is employed to develope the intention of the testator, and all of them, taken in connection, exhibit a transcript of his mind. 7 *Bac. Abr.* 341. & seq. *tit.* Wills. F. (*Gwil.* ed.)

" *After the decease*" of *Samuel*, the estate was to go to his eldest son or sons forever. Who was the eldest son of *Samuel*, *after his decease ;* the point of time in which the fact was to be determined ? Was it *Eli B.*, who was not living, and who, of consequence, was not at this period a son ? Or was it *Richard*, who, at the time proposed, was the eldest son of the testator then living ?

It is perfectly obvious, if the expression alluded to is construed as being synonimous with the *first born*, that it defeats the testator's general intent. For, on the death of *Eli B.*, without issue, either the devises in the will terminated ; and thus the intended object of a succession of life estates forever would be defeated ; or the estate intended to pass on without limitation in the line of one of the children of *Samuel*, is taken

*Allyn*
*v.*
Mather.

from this direction, and conferred on the eldest male child of any of the testator's three sons. This would be a very unreasonable construction, and in opposition to the well-founded presumption, that the testator intended to benefit the family of *Samuel*, and not to give, in exclusion of the eldest son of his, living at his decease, a new line of succession to those, who before were competently provided for.

The words of the testator, construed in reference to the subject matter, leave no reasonable doubt as to his intention. *Lord Hardwicke*, in *Lenox* v. *Holmden*, 1 *Ves.* 294. observes, he could not agree, that *first son* (an expression synonimous with *eldest son*,) is to be always taken strictly in the sense of *primogenitus*, but in the sense of an elder son, senior, or *maximus natus*. The propriety of the observation is unquestionable. The different object of a speaker, often gives a different meaning to the same word. Thus, the expression he will not *hear* you, may well be understood, in connection with the subject matter, either that the person addressed will not hear, by reason of extreme deafness, or that he will not be persuaded, by reason of the prejudice of his mind. The expression the *eldest son*, may be moulded, by the subject matter, and the will be construed to mean, not the *primogenitus*, but the *eldest* living at the death of his father. That such, in this case, was the intention of the testator, admits of no reasonable doubt. When a testator creates a series of life estates, to the eldest son of the tenant for life in succession, it can scarcely be conceived, that the intended limitation was to a son, who should die before the life estate was to commence ; but rather to one who was living, and capable of taking and enjoying the estate.

When we look at the whole will, and give effect to every part of it, the intention of the testator is not susceptible of a reasonable doubt. Throughout the entire will he uses expressions denoting his intent, that each life estate should commence, both as to the right and the enjoyment, on the termination of the former. He first gives a life estate to his son *Samuel Wolcott Allyn*. He then says, " *after my son's death*," I give the same premises to my grandsons, during their natural lives. Pursuing the same phraseology, he next subjoins, that " *after their decease*," he devises the premises to each of their eldest sons. He gives nothing to either devisee, either in right or in enjoyment, until the termination of the preceding life estate ; and what good reason can be assigned why he should ?

If an estate for life had been given to one of the testator's children, with remainder to another, from the nature of the case, as both these estates are only the parts of one estate, the right of the remainder-man would exist before his possession; but estates for life, from their nature, are separate and independent of each other. Hence, it results from the entire disconnection of these estates, that it is sufficient that the right and enjoyment should commence their existence at the same time. Of this opinion was the testator; and by the words " *after his decease,*" that is, the death of the prior tenant for life, the right and possession of the subsequent tenant, was to exist.

From this, it follows, that *Eli B.,* who died before his father, by the testator's intention, took nothing; and that the estate fell on *Richard,* who was the eldest son at his father's death.

That an estate for life in the plaintiff, according to the particular intent of the testator, contravenes no rule of law, is indisputable. He is the immediate issue and descendant of a person in being, at the time the will was made; and hence is capable of taking the estate as a purchaser. *Stat.* 301.

This construction, however, would defeat the testator's general intent, which was, to create an interminable succession of estates in the premises; for the son of *Richard,* on the established principle of law, as well as by our statute, (*p.* 301.) being the issue of unborn issue, cannot take the estate otherwise than by descent. To effectuate, therefore, the general intent of the testator, it is necessary to vest in the plaintiff a fee tail. " It has been the settled doctrine of *Westminster-Hall,*" said Lord *Kenyon,* in *Doe* d. *Cook* & al v. *Cooper,* 1 *East* 229. 234. " that there may be a general and a particular intent in a will, and that the latter must give way, when the former cannot otherwise be carried into effect." (*Vid.* 1 *Burr.* 38.) On this principle the case of *Humberston* v. *Humberston,* 1 *P. Wms.* 332. was decided.

That case was a devise of land to a corporation, in trust, for a number of successive lives, a part of the devisees being unborn at the making of the will. It was said, by Lord Chancellor *Cowper:* " Though an attempt to make a perpetuity for successive lives be vain, yet so far as it is consistent with the rules of law, it ought to be complied with; and therefore, let all the sons of these several *Humberstons* that are already born, take estates for their lives; but where the limitation is to

the first son unborn, there the limitation to such unborn son shall be in tail male." This was a construction of the will, according to the testator's intention. The great object was, in that case, and so it is in the present, to create a succession of estates ; and the particular *mode* prescribed may well be disregarded, when it becomes necessary, to prevent the devise from being defeated. This point has often been discussed, and has been established, by numerous determinations. *Nicholl* v. *Nicholl*, 2 *Bla. Rep.* 1159. *Pitt* v. *Jackson*, 2 *Bro. Ch. Ca.* 51. *Chapman* d. *Oliver* & al. v. *Brown* & al. 3 *Burr.* 1626. *Robinson* v. *Hardcastle* & al. 2 *Term Rep.* 241.

The plaintiff, pursuant to the intention of the testator, and the settled principles of law, has an estate tail in the premises ; and of consequence, is entitled to a recovery, if there has been an ouster. Of this there is no room for controversy. The defendant was in possession, at the time of the action brought, and claimed he had right to possess as the tenant of *Mary E.* This is sufficient evidence of ouster. *Doe* d. *Fisher* & ux. v. *Prosser, Cowp.* 217. *Doe* d. *Hellings* & ux. v. *Bird*, 11 *East* 49.

I would therefore, advise that judgment be rendered for the plaintiff.

PETERS and BISSELL, Js. were of the same opinion.

DAGGETT, J. It appears to be admitted, that, under the will of *Pelatiah Allyn*, his grandsons, *Samuel* and *Wolcott Allyn*, took vested remainders for life only in the property in question. The rule on the subject is correctly laid down, by Chief Justice *Willes*, in his opinion in the case of *Ginger* v. *White, Willes Rep.* 348. In the course of that opinion, referring to *Wilde's* case, he says : " If a devise be to *A.* and his children, if there be no children then in being, it gives an estate tail, because the devise is in words *de presenti ;* and there being no children in being, they must take by way of limitatian. But if a devise be to *A.*, *and after his decease,* to his children, *A.* has only an estate for life, because then the words plainly shew, that the children were intended to take by way of remainder." The case before the court clearly comes within the last clause of the rule thus stated. The will expressly confines the interest of *Samuel* and *Wolcott Allyn* to " during their natural lives," and provides, that " after their

decease" the estate shall go " to each of their eldest sons." <span>*Hartford,*</span>
Without enlarging on this subject, I will only say, that I see no <span>June 1832.</span>
reason to doubt, that *Samuel Allyn* and *Wolcott Allyn* took       Allyn
vested remainders for life ; and that the limitations over to       *v.*
their eldest sons, were to them as purchasers.       Mather.

I am also of opinion, that the last clause of the provision in
question of the will of *Pelatiah Allyn* can have no effect in the
present case.    That clause is predicated upon the contingency
of his said grandson's not having eldest sons.    But as his
grandson *Samuel* did have an eldest son *Eli B.,* and also at the
time of his death left a son *Richard,* who was then his eldest
son living, it appears, very clear, that the contingency can nev-
er occur on which said last clause was to operate ; and, there-
fore, that clause may be placed wholly out of view.    It is ne-
cessary here to remark, that no other property is now in ques-
tion, except that which was devised to the grandson *Samuel
Allyn* for his life, and that this opinion is to be considered as
confined to that part of the property of the testator.

Having ascertained that the grandson *Samuel Allyn* took an
estate for life only, and that whatever interest was devised to
his eldest son, was intended to vest in him as a purchaser ;
and that the last clause of the provision in question of the will
is to be laid out of view ; the ground of controversy is reduc-
ed within a very narrow compass.    The only question which
remains is—what is the correct and legal construction of the
words—" to each of the eldest sons" of the testator's grand-
sons *Samuel* and *Wolcott,* " lawfully begotten, and so from eld-
est son or sons forever."    The rules to be applied in constru-
ing wills, are too well settled to require being here stated.    It
will be sufficient to observe,—that the real intention of the tes-
tator is, if possible, to be ascertained ;—that in ascertaining
that intention, every word ought to be considered ;—that when
the intention is ascertained, it is to be carried into full effect,
unless it contravenes some legal principle ;—and that if the
intention cannot be carried into full effect, it is to be carried as
nearly into effect as the law will permit.    What the real inten-
tion of the present testator was, with respect to the property
in question, appears to be clear.    He wished his son to enjoy
it during his life, and his grandson during his life, and so
on forever.    But this intention contravenes a legal principle,
and cannot be carried into full effect.    By out statute (which,
however, is only in affirmance of our common law,) it is pro-

vided, that no estate shall be given by will to any persons, but to such as are in being, or to the *immediate* issue of such as are in being, at the time of making such will. *Stat.* 301. This was the common law of *Connecticut*, when the will in question was made, and when the testator died ; and it is obvious, therefore, that no persons can take as purchasers after the issue of the grandson *Samuel Allyn.* The issue of this grandson can take directly, and by way of purchase ; because they are the immediate descendants of a person in being at the making of the will ; but with them the capacity of taking by purchase terminates. If more remote descendants have rights under the will, it must be as the representatives of the issue of the grandson *Samuel.* As, then, the intention of the testator cannot be completely effectuated, it becomes necessary to consider what estate allowed by law will be nearest to that which he intended. And it is clear, that an estate tail will better correspond with his views than an estate in fee simple. If it is decided, that the eldest son of the grandson *Samuel* takes an estate tail, neither he nor his creditors can destroy the rights of his issue. It must, then, be the legal construction of the will, that an estate tail was given to the eldest son of the testator's grandson *Samuel Allyn.* But at the death of the testator, there was no such eldest son ; and therefore, this estate tail was a contingent remainder after the previous life estates. When *Eli B. Allyn,* the first son of *Samuel Allyn,* was born, did this contingent remainder vest in him as a vested remainder in tail, or did it continue a contingent remainder till the death of *Samuel,* and then vest in the eldest living son of *Samuel ?* I think there cannot be much doubt on this subject. " The law favours vested estates, and no remainder will be construed to be contingent, which may, consistently with the intention, be deemed vested." 4 *Kent's Comm.* 195. On the same principle, a contingent remainder will be construed to have become a vested remainder, as soon as such a state of facts exists under the will as fairly admits of that construction. In the present case, *Eli B. Allyn* was the first son of *Samuel Allyn ;* and, as soon as he was born, there was a person, fully answering the description of the will, in whom the contingent remainder could vest ; and there was no reason why the remainder should not so vest. To consider the contingent remainder as continuing after the birth of *Eli B. Allyn,* we must disregard a well settled and most salutary rule of law, and

*Hartford,*
June, 1832.

Allyn
*v.*
Mather.

hold, in direct opposition to all the authorities, that an estate shall be construed to be contingent, when it might clearly be deemed vested. I am not prepared to act upon such a principle ; and, therefore, am of opinion, that, on the birth of *Eli B. Allyn*, the contingent remainder in tail ceased, and a vested remainder in tail vested in said *Eli B. Allyn*, to be enjoyed in possession after the determination of the previous life estates. And in coming to this result, I not only follow the settled rules of law, but also, as I think, give effect to the language of the testator, according to its natural and ordinary meaning.

I have thus come to the result, that *Eli B. Allyn*, on his birth, took a vested remainder in tail in the property in question ; and if the estate, which he thus took, was an estate in tail general, his daughter *Mary E. Allyn* is now the owner of the property, she being his only child and heir. But did *Eli B.* take an estate in tail general ? It has already appeared, in the course of this opinion, what was the intention of the testator, and also why the eldest son of the grandson *Samuel* should take an estate tail rather than a fee simple. But an estate in tail male is clearly nearer to the intention of the testator than an estate in tail general. The testator designed that the property should go from eldest son to eldest son indefinitely, each eldest son having only a life estate. An estate in tail male excluding females, would be more in conformity to such design, than an estate in tail general, admitting females. An estate in tail male, limited to the eldest son of the tenant in tail, would be still nearer the testator's design ; but, as there would be great doubt whether such a limitation would be lawful, and the tenant in tail *Eli B. Allyn* never had male issue, I think it unnecessary to claim any thing further than that *Eli B.* ought to be considered as taking an estate in tail male, rather than an estate in tail general, if by law he could take an estate in tail male.

The only question, then, is—does the law of *Connecticut* permit estates in tail male ? And here I may be confident in saying, that no reason for a doubt on this subject is furnished by our books. No decision, no *dictum*, no opinion of an elementary writer, is referred to, which is in opposition to such an estate with us. On the contrary, it was expressly decided, in the case of *Dart* v. *Dart*, 7 *Conn. Rep.* 250. that the estate of the plaintiff, *Caleb Dart*, was a tenancy in tail male, under the will of his grand-father *Roger Dart*. That case would be con-

clusive, unless the fact that the result would have been the same had the estate been a tenancy in tail general, may be considered as rendering the decision on the point in question unnecessary, and, therefore, not of binding authority. I am willing to give such effect to that fact; and shall proceed to enquire whether the principle, now first contended for in this state, is sound.

When our law adopted estates tail from the *English* law, it adopted them as they were known in *England,* with certain qualifications rendered necessary by the genius of our institutions. One of those qualifications was, that no estate tail should be perpetual, but that all such estates should vest in fee in the issue of the first tenant in tail. But there never was any reason for our not recognizing special tenancies in tail. May not a devisor give property to his son and to his issue by a particular wife? I see no objection to such an estate, and should have no hesitation in saying, that issue by another wife could not take. And I see as little reason for an objection to an estate in tail male. If a devisor prefers to give his property to his son and the male issue of the son, no disadvantage can result from allowing full effect to the devise. Certainly, we ought not to disregard one of the most important features of *English* estates tail, without substantial reason :—and, unless we do, we must hold, that special estates tail may exist with us, and, also, that our law recognizes the distinction of estates in tail male and tail female.—Our statute, which provides, that the issue of the first tenant in tail shall take a fee simple estate, has no bearing on the subject. What issue are to take is first to be decided, upon a fair construction of the deed or will ;— and then the statute operates and enlarges the estate into a fee simple, in the hands of such issue. The object of the statute was to prevent perpetuities. For that purpose, it converted estates tail into estates in fee ;—but it went no further. There was no reason for giving an estate to the issue generally, or the first tenant in tail, when the person creating the estate directed that it should go to some special issue ;—and it would require a strained construction to make the statute so operate. The word " issue," used in the statute, is a general term. It includes a man's children of every character, male and female, by one wife or several ;—and may mean the whole or a part of them, according to circumstances. The intention of the legislature would not have been carried into complete effect,

unless they had used such a general term. Their design was, to convert estates tail into in estates in fee, the hands of all issue in tail, as well special as general issue, as well male as female issue. In whatever issue the estate tail vested, the statute operated upon the estate so vested, and enlarged it into a fee simple : but it did not intend to interfere at all with the question in what issue the estate tail should vest. This is left to be decided, by the principles of the *English* law, as applied to the facts of each particular case. When that question was decided, and the estate in tail vested in the proper issue, then, and not before, the statute operated. This, in my opinion, is the natural construction of the statute ; and I adopt it without any doubt of its correctness.

I thus come to the result, that estates in tail male are allowed by our law ;—and that *Eli B. Allyn* took an estate in tail male in the property in question.

The only remaining enquiry is,—what became of the property, which *Eli B. Allyn* held in tail male, on his decease. It could not descend to his daughter ; as she did not come within the description of the issue to whom the estate was limited. It could not devolve on his brother *Henry ;* for the words in question were completely satisfied when they vested an estate tail in the first eldest son, and will not admit of the construction, that, at different periods, different sons might take the same estate, as respectively answering, at those different periods, the character of eldest son. For the same reason, (and several others which it is unnecessary to mention) it could not become loaded with another contingent remainder, to take effect, on the death of *Samuel Allyn,* in favour of the eldest son, who should survive his father. Nor could it be affected, by the last clause of the provision in question of the will ; since that clause, as has already been shown, became inoperative on the birth of *Eli B. Allyn.* No other provision of the will is produced, which can have any effect, as the facts appear ;—and, therefore, it follows, that, on *Eli B's* death, the property, which he held as tenant in tail, became intestate estate of the original testator *Pelatiah Allyn,* and, as such, descended to all his heirs at law.

Reviewing the ground which I have been over, and collecting the several important results, I am of opinion ;

First, That *Samuel Allyn,* the grandson of the testator, took

Allyn
*v.*
Mather.

in the property in question an estate for life, with a contingent remainder in tail male to his eldest son.

Secondly, That, on the birth of *Eli B. Allyn*, the first son of *Samuel Allyn*, the contingent remainder became a vested remainder, vesting in said *Eli B.* as an estate in tail male.

Thirdly, That, on the death of *Eli B. Allyn* without male issue, the property descended to the heirs generally of *Pelatiah Allyn*, as intestate estate.

The plaintiff, then, is a tenant in common with the defendant and others ; but as there is no proof of an ouster by the defendant, he cannot recover, but the judgment must be for the defendant.

WILLIAMS, J., having been of counsel in the cause, gave no opinion.

Judgment for plaintiff.